UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
(Nashville Division)

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF TENNESSEE, ) ) ) ) | |
| Plaintiffs, ) ) | CIVIL ACTION NO. **3  07**, **1 0 5 6** |
| v. ) ) | **JUDGE ECHOLS** |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, ) ) ) ) | |
| Defendant. ) ) ) ) | |

## CONSENT DECREE

### INTRODUCTION

WHEREAS, the United States of America, on behalf of the Administrator of the United

States Environmental Protection Agency ("EPA"), filed a Complaint alleging that the Defendant,

the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro"), acting

by and through its Department of Water and Sewerage Services, has violated the Clean Water

Act, 33 U.S.C. § 1251, *et seq.* ("CWA"); and

WHEREAS, the CWA imposes strict liability based upon any violation of the CWA; and

WHEREAS, on April 30, 2007, the State of Tennessee ("State") issued a sixty (60) day

notice of intent to sue Metro pursuant to 33 U.S.C. § 1365, and thereafter filed a Complaint

1

5

against the Defendant for alleged violations of the CWA and the Tennessee Water Quality Control Act ("TWQCA"), Tenn. Code Ann. §§ 69-3-101, *et seq.*; and

WHEREAS, the United States and the State (collectively "Plaintiffs") have moved jointly that the two federal actions be consolidated, and Metro does not oppose that motion; and

WHEREAS, Metro is a governmental entity created by Tenn. Code Ann. §§ 7-1-101, *et seq.*; and

WHEREAS, Metro owns and operates municipal wastewater collection, retention and transmission systems designed to collect and convey municipal sewage (domestic, commercial and industrial) to its wastewater treatment plants ("WWTPs") or to its combined sewer overflows ("CSOs"), and is the holder of National Pollutant Discharge Elimination System ("NPDES") permits authorizing the discharge of pollutants from certain outfalls; and

WHEREAS, the collection, retention and transmission systems consists of separate sanitary sewer systems ("SSS") and combined sewer systems ("CSS"); and

WHEREAS, Metro maintains agreements with certain residential customers providing for the maintenance of grinder pumps located at such customers' residences and intends to continue to honor those agreements (the "Grinder Pump Maintenance Agreements"); and

WHEREAS, Metro, the City of Brentwood, Tennessee and the Tennessee Department of Environment and Conservation ("TDEC") entered into an Agreed Order, dated May 23, 2006, which addresses violations of the TWQCA at a pump station owned by the City of Brentwood and operated by Metro under a contractual agreement (the "Brentwood Pump Station"); and

WHEREAS, EPA Region 4 invited Metro by letter dated February 6, 2006, to participate in the Capacity, Management, Operations and Maintenance ("CMOM") Programs Project; and

2

WHEREAS, Metro agreed to participate in the CMOM Programs Project, which participation was confirmed through correspondence dated March 8, 2006 and Metro's attendance at the CMOM Programs Project Kick-off meeting of March 2, 2006; and

WHEREAS, EPA established a completion deadline of October 2, 2006 for Metro to submit a CMOM self-assessment; and

WHEREAS, Metro voluntarily has undertaken a self-assessment of its sanitary sewer collection and transmission systems to evaluate the capacity, management, operation and maintenance of its infrastructure, including its effectiveness at minimizing sanitary sewer overflows ("SSOs"), and in connection therewith, submitted to EPA its self-assessment on September 25, 2006 ("CMOM Self-Assessment"); and

WHEREAS, Metro's CMOM Self-Assessment made several recommendations to improve or refine Metro's current CMOM programs; and

WHEREAS, as a result of the CMOM self-assessment process and recommendations, Metro has already modified, refined, created, and it is now implementing several recommendations included in the CMOM Self-Assessment; and

WHEREAS, TDEC issued order #88-3364 on March 30, 1990, and order #99-0390 on September 17, 1999 to eliminate all non-compliant Combined Sewer Overflow ("CSO") discharges by December 31, 2007; and

WHEREAS, Metro, in response to the orders, reduced the number of combined sewer overflow outfalls ("CSO Outfalls") from 32 to 8; and

WHEREAS, Plaintiffs contend that Metro must update its Long Term Control Plan as well as improve upon its implementation of the Nine Minimum Controls to ensure that its CSOs

3

fully comply with EPA's 1994 CSO Control Policy, 59 Fed. Reg. 18688 ("CSO Control Policy"); and

WHEREAS, Metro certifies that it has documentation that the following accomplishments have been achieved between 1990 and 2007: a reduction in the volume of SSOs by 99%; a reduction in the frequency of SSOs by 45%; a reduction in the number of SSO locations from 164 to 27; the completion of over 260 projects to rehabilitate, parallel, or replace sewer lines, improve the capacity and reliability of sewer pumping stations, provide in-system storage for flow equalization, and increase WWTP capacity; the rehabilitation of over 317 miles of its wastewater collection system and the removal of over 3 billion gallons of inflow/infiltration annually from its wastewater collection system; a reduction in the frequency of CSO discharges by 59%; a reduction in the volume of CSO discharges by 72%; a reduction in the duration of CSO discharges by 83%; and a decrease of 15% in the average daily flow of sewage for treatment while experiencing an increase of 37% in the number of customers and 40% in the total footage of sewers reflecting the removal of inflow/infiltration into its wastewater collection system; and

WHEREAS, while Plaintiffs have not verified the information supporting the above-listed accomplishments, Plaintiffs do acknowledge the great progress that Metro has made, especially recently, in addressing problems within its Sewer System such as greatly reducing the frequency and volume of its SSOs and CSOs; and

WHEREAS, as announced at an event with EPA, TDEC, and Metro held on the bank of the Cumberland River in November 2002, 33 miles of the Cumberland River was removed from the EPA 303(d) list, the list of impacted waters of the State, for pathogens, reflecting the benefits of Metro's Overflow Abatement Program; and

4

WHEREAS, in this Consent Decree, Metro agrees to pay a civil penalty and to perform injunctive relief in settlement of the civil claims alleged in Plaintiffs' Complaints; and

WHEREAS, by entering this Consent Decree, Metro does not admit any liability to the Plaintiffs arising out of the transactions or occurrences alleged in the Complaints; and

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith, that implementation of this Consent Decree will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest;

NOW THEREFORE, before the taking of any testimony, without admission by Metro of the non-jurisdictional allegations in the Complaints, without adjudication of any issue of fact or law, and upon the consent and agreement of the Parties to this Consent Decree, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I.  JURISDICTION

A.     This Court has jurisdiction over the subject matter herein and the Parties to these consolidated actions pursuant to sections 309, 504 and 505 of the CWA, 33 U.S.C. §§ 1319, 1364 and 1365, and 28 U.S.C. §§ 1331, 1345 and 1355. This Court has subject matter jurisdiction over the state law claims of the State of Tennessee pursuant to 28 U.S.C. § 1367 and principles of supplemental jurisdiction, because the state law claims are so related to the Plaintiffs' federal law claims that they form part of the same case or controversy. The Complaints state claims upon which relief may be granted against Metro for injunctive relief and civil penalties. Metro agrees not to contest the jurisdiction of the Court to enter and enforce this Consent Decree. Authority to bring suit herein on behalf of the United States is vested in the

5

United States Department of Justice by 28 U.S.C. §§ 516 and 519, and 33 U.S.C. §§ 1366 and 1369. The Tennessee Attorney General has authority to bring this action on behalf of the State of Tennessee in accordance with Tenn. Code Ann. § 8-6-109.

## II. VENUE

Venue is proper in the United States District Court for the Middle District of Tennessee, pursuant to sections 309(b) and 505 of the CWA, 33 U.S.C. §§ 1319(b) and 1365, and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because it is the judicial district in which Metro is located and in which the alleged violations occurred.

## III. PARTIES BOUND

A.     This Consent Decree applies to, and is binding upon, the Parties and their officials, officers, directors, employees, agents, servants, successors and assigns, and upon all persons, firms and corporations who assist Metro in performing its obligations under this Consent Decree.

B.     Metro shall provide a copy of this Consent Decree to any consultant and contractor selected or retained to perform any activity required by this Consent Decree.

C.     No later than twenty-one (21) Days prior to transfer of any ownership interest, operation, management, or other control of the Sewer System or a WWTP or any portion thereof, Metro shall give written notice and provide a copy of this Consent Decree to any such transferee or successor in interest. Metro shall require, as a condition of any such sale or transfer, that the purchaser or transferee agree in writing to be bound by this Consent Decree and submit to the jurisdiction of the Court for its enforcement. Metro shall also notify EPA Region 4, DOJ, and TDEC of any such planned transfer in accordance with Section XX (Form of Notice) of this

6

Consent Decree at least twenty-one (21) Days prior to the transfer, or if that is impossible, as soon as practicable. Metro may transfer within any twelve (12) Month period, an ownership interest, operation, management, or other control of portions of the Sewer System of up to one hundred (100) residential customer accounts, or the volumetric equivalent thereof, without this Section III.C applying to the Metro successors or assigns who take ownership or control of such portions of the Sewer System.

## IV. <u>OBJECTIVES</u>

It is the express purpose of the Parties to further the objectives set forth in section 101 of the CWA, 33 U.S.C. § 1251, and to resolve Plaintiffs' claims for civil penalties and injunctive relief alleged in the Complaints in a manner consistent with the CWA, the TWQCA, and regulations promulgated under the CWA and the TWQCA. In light of these objectives, Metro agrees, *inter alia*, to perform the Work set forth in this Consent Decree; to use sound engineering practices to perform the Work; to use sound management, operation and maintenance practices to implement all the requirements of this Consent Decree; to expeditiously implement this Consent Decree under reasonable schedules using sound engineering practices; and to use its best efforts to achieve the goals of: (1) full compliance with the NPDES Permits, the CWA, the TWQCA, and their regulations; (2) the elimination of all SSOs, and (3) achieving compliance with EPA's CSO Control Policy including compliance by Metro's CSOs with water quality standards. Any schedules set forth in Deliverables shall reflect Metro's commitment to initiate and complete all Work under reasonable schedules. Metro shall maintain sufficient financial and personnel resources and sufficient equipment and analytical services to administer and implement the Work.

7

# V. DEFINITIONS

A.     Unless otherwise defined herein, terms used in this Consent Decree shall have the meaning given to those terms in the CWA, 33 U.S.C. §§ 1251, *et seq.*, and the regulations promulgated thereunder. For purposes of this Consent Decree, whenever terms listed below are used in this Consent Decree or appendices attached hereto and/or incorporated hereunder, the following definitions shall apply:

1.     "Building Backup" is a wastewater backup into a building that is caused by blockages, malfunctions, or flow conditions in the Sewer System. A wastewater backup into a building that is caused by a blockage or other malfunction of a Private Lateral is not a Building Backup.

2.     "Bypass" shall have the meaning set forth at 40 C.F.R. § 122.41(m).

3.     "Calendar Quarter" shall mean the three (3) month periods ending on March 31st, June 30th, September 30th, and December 31st.

4.     "Calendar Year" shall mean the twelve (12) month period starting on January 1 and ending on December 31.

5.     "Certification" or "certify" when used in this Consent Decree shall require Metro Water to comply with Section XVIII of this Consent Decree.

6.     "Combined Sewer Overflow" or "CSO" shall mean any discharge from any outfall currently identified, or identified in the future, as a combined sewer overflow or CSO in any Metro NPDES permit.

7.     "Combined Sewer Overflow Outfall" or "CSO Outfall" shall mean the outfalls from which CSOs are discharged to waters of the United States or the State

8

8. "Combined Sewer System" or "CSS" shall mean the portion of Metro's Sewer System designed to convey municipal sewage (domestic, commercial and industrial wastewaters) and stormwater runoff through a single-pipe system to Metro's Nashville Central Wastewater Treatment Plant or Combined Sewer Overflow Outfalls.

9. "Consent Decree" or "Decree" shall mean this document and all appendices hereto. In the event of a conflict between this document and any appendix, this document shall control.

10. "CWA" shall mean the Clean Water Act, as amended, 33 U.S.C. §§ 1251, *et seq.*

11. "Date of Entry" shall mean the date on which this Decree is entered by the United States District Court for the Middle District of Tennessee.

12. "Date of Lodging" shall mean the date on which this Decree is lodged by the United States with the United States District Court for the Middle District of Tennessee for a period of public comment.

13. "Day" or "Days" as used herein shall mean a calendar day or calendar days, unless otherwise indicated. When the day a report or other Deliverable is due under this Consent Decree falls on a Saturday, Sunday, or federal, State or Metro holiday, a Party shall have until the next calendar day that is not one of the aforementioned days for submittal of such report or other Deliverable.

14. "Defendant" shall mean Metro and any successor thereto.

15. "Deliverable" shall mean any written document required to be prepared and/or submitted by or on behalf of Metro pursuant to this Decree.

9

16. "DOJ" shall mean the United States Department of Justice, including any successor departments or agencies of the United States.

17. "EPA" shall mean the United States Environmental Protection Agency, including any successor departments or agencies of the United States.

18. "Metro" shall mean the Defendant in this action, the Metropolitan Government of Nashville and Davidson County, Tennessee, including all of its departments, agencies and instrumentalities such as the Department of Water and Sewerage Services, and any successor thereto.

19. "Month" shall mean one calendar month running from the numbered day to the same numbered day of the following calendar month, regardless of whether the particular month has 28, 29, 30 or 31 days. In the event a triggered event would occur on a day of the month which does not exist (for example, on February 30), then the event shall be due on the first day of the following month (for example, March 1).

20. "NPDES Permits" shall mean the most recently issued National Pollutant Discharge Elimination System Permits issued to Metro, including, but not limited to, those permits issued for the Nashville Central Wastewater Treatment Plant, Permit No. TN0020575 issued March 31, 2006; the Nashville Dry Creek Wastewater Treatment Plant, Permit No. TN0020648 issued November 30, 2005; and the Nashville Whites Creek Wastewater Treatment Plant, Permit No. TN0024970 issued November 30, 2005.

21. "Parties" shall mean the United States on behalf of EPA, the State, and Metro.

22. "Private Lateral" shall mean that portion of a sanitary sewer conveyance

10

pipe, including that portion in the public right of way, that extends from the wastewater main to the single-family, multi-family, apartment or other dwelling unit or commercial or industrial structure to which wastewater service is or has been provided.

23. "Public Document Repository" or "PDR" shall mean the main branch of the Nashville Public Library, located at 615 Church Street, Nashville, Tennessee 37219 and the Metro website.

24. "Sanitary Sewer Overflow" or "SSO" shall mean an overflow, spill, or release of wastewater from the Sewer System including: (a) Unpermitted Discharges; (b) overflows, spills, or releases of wastewater that may not have reached waters of the United States or the State; and (c) all Building Backups.

25. "Section," when used without a specific reference to a particular paragraph within this Consent Decree, shall mean a portion of this Consent Decree identified by an uppercase Roman numeral.

26. "Sewer System" shall mean the wastewater collection, retention, and transmission systems, including all pipes, force mains, gravity sewer lines, lift stations, pump stations, manholes and appurtenances thereto, owned or operated by Metro designed to collect and convey municipal sewage (domestic, commercial and industrial) to Metro's WWTPs or CSOs which is comprised of the SSS and CSS; provided, however, that Private Laterals, the Brentwood Pump Station and the grinder pumps maintained by Metro pursuant to the Grinder Pump Maintenance Agreements shall not be considered a part of the Sewer System for purposes of this Consent Decree.

27. "State" shall mean the State of Tennessee, including all of its departments,

11

agencies and instrumentalities.

28. "TDEC" shall mean the Tennessee Department of Environment and Conservation and any successor departments or agencies of the State.

29. "Timely," when applied to the submittal of a Deliverable shall mean submitted no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and containing all of the elements pertaining to the submittal as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree). "Timely," when applied to the implementation of any Work shall mean implemented no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and in accordance with the elements pertaining to such Work as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree).

30. "TWQCA" shall mean the Tennessee Water Quality Control Act, Tenn. Code Ann. §§ 69-3-101, *et seq.*

31. "United States" shall mean the United States of America, including its departments, agencies and instrumentalities.

32. "Unpermitted Discharge" shall mean a discharge of pollutants which reaches waters of the United States or the State from (a) the Sewer System, (b) WWTPs through a point source not specified in an NPDES Permit, or (c) WWTPs which constitutes a prohibited Bypass.

33. "Wastewater Treatment Plant" or "WWTP" shall mean devices or systems used in the storage, treatment, recycling, and reclamation of municipal wastewater. For purposes of this Consent Decree, this definition shall include all facilities owned, managed, operated, and

12

maintained by Metro, including but not limited to the following treatment facilities: Nashville

Central Treatment Plant, Nashville Dry Creek Treatment Plant, and Nashville Whites Creek

Treatment Plant.

      34.   "Work" shall mean all activities Metro is required to perform under this

Consent Decree.

## VI.  REVIEW, APPROVAL AND IMPLEMENTATION OF DELIVERABLES

    A.   1.   Prior to the submission of a Deliverable to EPA and TDEC, Metro shall

notify the Reference Librarian at the main branch of the Nashville Public Library (located at 615

Church Street in downtown Nashville) identifying the Deliverable to be submitted and providing

a one-page instruction flyer containing a brief synopsis of the Deliverable and instructions on

how to navigate to Metro's website and shall make available a copy of each Deliverable on

Metro's website. The main branch of the Nashville Public Library and Metro's website shall

constitute the Public Document Repository ("PDR"). Further, Metro shall make reasonable

efforts to provide the same information to the other large branch offices of the Library, but shall

not be subject to stipulated penalties for failure to do so. Metro shall then allow the public a

period of thirty (30) Days to inspect and comment to Metro on the Deliverable ("Public Review

Requirement"). Metro shall provide instructions to the public in the PDR for submitting a

comment. Thereafter, Metro shall consider public comments for a period of up to fifteen (15)

Days.

      2.   Metro shall bear the sole responsibility for depositing all Deliverables in

the PDR. Within seven (7) Days after its submission to EPA and TDEC, Metro shall place a

copy of the submitted version of the Deliverable in the PDR in the same fashion as for the

original submission. Within seven (7) Days after EPA's approval, approval upon conditions, or modification by EPA pursuant to this Section, Metro shall place a copy of such version of the Deliverable in the PDR. Such copy shall replace all previous copies of that Deliverable in the PDR, and shall remain in the PDR along with all comments until termination of this Consent Decree. In addition, Metro shall maintain in the PDR a listing of all Deliverables and comments.

B.    Review of Deliverables.

1.    Initial Submittal. All Deliverables shall be submitted to EPA and TDEC for review. After a reasonable period of consultation with the State, EPA may, in its discretion: (a) approve, in whole or in part, the Deliverable; (b) approve the Deliverable upon specified conditions; (c) disapprove, in whole or in part, the Deliverable, directing Metro to modify the Deliverable; or (d) any combination of the above. A disapproval under (c) or (d) of this Section VI.B.1 will set forth the reasons for the deficiencies in sufficient detail for Metro to correct the deficiencies.

2.    Obligation to Implement Deliverable. In the event EPA approves, or approves upon conditions, the submission, or approves, approves upon conditions, or modifies any resubmission of a Deliverable pursuant to this Section, Metro shall proceed to take any action required to implement the Deliverable, as approved or modified by EPA, subject only to its right to invoke dispute resolution pursuant to Section XII (Dispute Resolution).

3.    Resubmission of Disapproved Deliverable.

(a)    Upon receipt of a notice of disapproval pursuant to Section VI.B.1(c) or (d), Metro shall, within thirty (30) Days, or such longer time as specified by EPA in such notice or agreed to in writing by EPA, revise the Deliverable as required by EPA and

14

resubmit the Deliverable to EPA for approval, subject only to Metro's right to invoke dispute resolution pursuant to Section XII (Dispute Resolution). Concurrent with the resubmission to EPA, the revised Deliverable shall also be provided to TDEC.

(b) Any portion of a Deliverable that is not specifically disapproved by EPA in a notice of disapproval shall be considered approved and Metro shall proceed to implement the approved portion of the Deliverable, provided that implementation of the approved portion of the Deliverable is not dependent upon implementation of the disapproved portion. Implementation of the approved portion of a Deliverable shall not relieve Metro of liability for stipulated penalties under Section X (Stipulated Penalties).

(c) In the event that a resubmitted Deliverable, or portion thereof, is again disapproved by EPA, after consultation with the State, EPA may again require Metro to implement changes as required by EPA, in accordance with the preceding paragraphs. EPA, after consultation with the State, may also modify the resubmitted Deliverable to cure the deficiencies, subject only to Metro's right to invoke dispute resolution pursuant to Section XII (Dispute Resolution).

4. <u>Deliverables Are Enforceable</u>. Deliverables, including all schedules set forth therein, shall be enforceable under this Consent Decree as if they were set forth herein upon approval, approval upon conditions, or modification by EPA, and after conclusion of any dispute resolution period. Any portion of a Deliverable that is not specifically disputed by Metro shall be enforceable during any dispute resolution period, provided that implementation of the non-disputed portions of the Deliverable is not dependent upon implementation of the disputed portion.

C.    <u>EPA Review of Deliverables</u>.  EPA agrees to use best efforts to expeditiously review and comment on Deliverables.  If EPA issues written comments and decisions on a Deliverable more than one-hundred and twenty (120) Days after receipt of such submission, any subsequent deadline or milestone that is dependent upon such comments or decisions shall be extended.  The length of the extension shall be determined by calculating the number of Days between EPA's receipt of the submission and the date of EPA's written response, less one-hundred and twenty (120) Days.  Within thirty (30) Days of the date that Metro knows or should know of a deadline or milestone that Metro believes is extended under this paragraph, Metro shall inform EPA, in writing, of its belief and the amount of time Metro believes the deadlines or milestones are extended.  If EPA disagrees with Metro's determination that a deadline is dependent upon such comments or decisions, EPA shall inform Metro in writing.  Metro may dispute EPA's conclusion regarding whether a deadline is dependent upon such comments or decisions pursuant to Section XII (Dispute Resolution).

D.    <u>Revisions to Deliverables</u>.  The Parties recognize that Metro may need or want to revise certain Deliverables during the term of this Consent Decree.  Such revisions shall not be considered modifications to the Consent Decree for purposes of Section XXI (Modification).  Metro must obtain EPA's prior written approval of any revision to the substance of a Deliverable and shall place copies of any such revised Deliverable in the PDR in accordance with the provisions of Sections VI.A.1 and 2.  Metro may revise the form of any Deliverable without consulting EPA and shall place a copy of any such revised Deliverable in the PDR within seven (7) Days after making such revision.

16

## VII. **PERFORMANCE OF THE WORK**

    A.    <u>Obligation to Perform Work</u>. Upon the Date of Entry, Metro shall implement the Work pursuant to this Consent Decree. Metro is responsible for ensuring that any contractors hired to perform Work pursuant to this Consent Decree comply with all applicable laws and with this Consent Decree. All Work shall be performed using sound engineering practices, which may include appropriate provisions of the *Handbook: Sewer System Infrastructure Analysis and Rehabilitation*, EPA/625/6-91/030, 1991; *Existing Sewer Evaluation and Rehabilitation*, WEF MOP FD-6, 1994; and the *Tennessee Design Criteria for Sewage Works* in accordance with Tenn. Comp. R. & Reg., ch. 1200-4-2-.03.

    B.    <u>Remedial Measures for Sanitary Sewer Overflows</u>

        1.    <u>Corrective Action Plan/Engineering Report ("CAP/ER") for Sanitary Sewer Overflows</u>. No later than twenty-four (24) months from the Date of Entry, Metro shall prepare and submit to EPA and the TDEC a Corrective Action Plan/Engineering Report ("CAP/ER") that addresses the conditions causing SSOs and with the goal of eliminating the SSO locations identified in Appendix A. To accomplish this goal, the CAP/ER shall identify the specific corrective action projects to be taken and any other alternatives considered but not chosen as a part of Metro's analysis. The CAP/ER shall also include a map clearly identifying known SSO locations, pertinent flow measurement data, and a project schedule for beginning and completing all Work specified in the CAP/ER. Among other items, in establishing the project schedule, Metro shall evaluate the frequency and severity of an SSO, the proximity of an SSO to public areas and the complexity of the corrective action necessary to eliminate an SSO. All such Work under the CAP/ER shall be completed no later than nine (9) years after the

17

approval or modification of Metro's CAP/ER pursuant to Section VI of this Consent Decree; provided, however, the CAP/ER shall include a completion date of December 31, 2008 for the Dry Creek Pump Station SSO location and a completion date of December 31, 2009 for the Barker Road SSO location. The Dry Creek SSO location and the Barker Road SSO location, as such locations are more particularly described on Appendix A, account for approximately fifty (50) % of Metro's total SSO volume over the five (5) years prior to the Date of Entry. The CAP/ER may include projects currently under construction and projects planned for construction currently identified in Metro's capital improvement plans which are consistent with the goals of the CAP/ER. In addition, upon request, Metro shall make available to EPA and TDEC any additional information in its possession that may be of use to EPA or TDEC in evaluating the CAP/ER.

      C. <u>Capacity, Management, Operation and Maintenance ("CMOM") Programs</u>.

         1. <u>Implementation of CMOM Programs</u>. Metro shall continue to implement the CMOM programs as described in Metro's CMOM Self-Assessment submitted to EPA and TDEC on September 25, 2006 and as updated on April 26, 2007. The referenced Self-Assessment report and update, excluding attachments, are attached hereto as Appendix B. Metro shall implement all the program recommendations included in Section 8 of the CMOM Self-Assessment no later than the implementation deadlines listed in the recommendation table of the same section. Within ten (10) Days of the Date of Entry, Metro shall place in the PDR all documents that constitute these programs. In the event Metro desires to substantially change or discontinue implementation of all or a portion of any of these CMOM programs, Metro shall submit such proposed change or request for discontinuance for review and EPA's approval. The

18

proposed change or discontinuance shall be placed in the PDR for public review and information, but shall not be subject to the Public Review Requirement of Section VI.A.1. However, Metro shall receive questions and comments from the public on such documents for a period of twenty (20) Days after placement in the PDR. For purposes of this paragraph, a substantial change to one of these CMOM programs or to the way in which one of these CMOM programs is implemented shall mean a change that materially or significantly hampers the beneficial purpose of that program.

      2.     Specific CMOM Program Development - Spill and Overflow Response Plan ("SORP"). Metro submitted an updated SORP to EPA and TDEC on May 4, 2007, which is attached hereto as Appendix C. Metro shall continue to implement this updated SORP and by June 1 of each year, Metro shall review the SORP and submit for review and EPA approval an update with any proposed changes as appropriate.

      3.     Specific CMOM Program Development - Inter-Jurisdictional Agreement Program. No later than six (6) months after the Date of Entry, Metro shall submit to EPA and TDEC an Inter-Jurisdictional Agreement Program for when Metro renews existing agreements or enters into new agreements that cover the collection, conveyance and treatment of sewage by Metro from municipal satellite sewer systems and/or large volume sewer customers. The program shall delineate the minimum provisions to be set forth in these agreements with which the contracting municipality or large volume sewer customer must comply. Such provisions shall include requirements on the contracting party to properly manage, operate and maintain its sewage collection and conveyance systems so as to minimize peak flows into Metro's Sewer System by excluding, to the maximum reasonable extent, the intrusion of surface and ground

19

water and other extraneous flows. The program shall also delineate provisions addressing the term or life of these agreements; mechanisms for appropriate modification of the agreements; and mechanisms for enforcement of the agreements (including a description of the legal support necessary to develop, oversee and enforce the agreements) such as provisions permitting termination of the agreement and physical disconnection from Metro's sewer system within a reasonable time not exceeding two (2) years upon the failure of the contracting party to comply with its management, operation and maintenance obligations. TDEC continues to be responsible in all respects for enforcing the requirements of any state operating permits for such municipal satellite sewer systems and/or large volume sewer customers. Metro shall not be responsible for enforcement of any such permits or for management or oversight of any such municipal satellite sewer systems and/or large volume sewer customers.

The parties acknowledge that Metro currently has in place agreements covering the collection, conveyance and treatment of sewage from certain other municipal satellite sewer systems that may or may not currently satisfy the requirements of the Inter-Jurisdictional Agreement Program as set forth above. Metro represents that these existing agreements may expire or terminate before or after the Date of Entry of this Consent Decree. When any of these currently existing agreements expire or terminate, Metro may, but shall not be required to, renew any such agreement or enter into a new agreement covering the collection, conveyance and treatment of sewage from such other municipal satellite sewer system. In the event Metro does renew such an agreement or enters into any new agreement, each agreement shall be consistent with the requirements of this Inter-Jurisdictional Agreement Program.

     4.     <u>CMOM Specific Program Development - Capacity Assurance Program</u>

20

Metro submitted an updated Capacity Assurance Program to EPA and TDEC on June 6, 2007, which is attached hereto as Appendix D. Metro shall continue to implement this updated Capacity Assurance Program.

     5.    <u>Specific CMOM Program Development - Pump Station Operation Plan for Power Outages</u>. No later than nine (9) months after the Date of Entry, Metro shall submit to EPA and TDEC a Pump Station Operation Plan for Power Outages. This operation plan shall include an evaluation of the adequacy of its current pump station backup power and emergency procedures for power outages achieved via emergency generators, emergency pumping capabilities, or separate power feeds from separate substations. Emergency generators may be either permanently installed or portable. Emergency pumping typically consists of portable, engine-driven pumps that can be quickly connected to a pump station.

     (a).    The evaluation of emergency procedures for power outages shall consider the following criteria:

        i.    An adequate alternative power source must have sufficient capability to operate the station at its rated capacity, as well as operate all ancillary equipment and instrumentation;

        ii.    Emergency pumping capability means modification of a pump station to allow rapid connection of a portable pump to the pump station and provision of a pump with the capability to handle that station's peak flows. This includes providing "quick-connect" couplers for both pump suction and discharge.

        iii.    The ability of maintenance personnel to take corrective action

21

within the critical response time calculated for each pump station.

    iv.    In evaluating the adequacy of its current situation, Metro shall consider its current inventory of portable pumps and its history of equipment failure-related, power-loss-related and lightning strike-related SSOs during the past five (5) years prior to the Date of Entry.

    (b).    Metro shall include in the Pump Station Operation Plan for Power Outages detailed information regarding the criteria specified above for each of its Pump Stations. In particular, the Pump Station Operation Plan for Power Outages shall:

    i.    Describe each pump station;

    ii.    Provide detailed information regarding the results of the evaluation of each pump station;

    iii.    Provide detailed information about its backup power, emergency pumping capability, and emergency procedures at each pump station;

    iv.    Provide information regarding lightning strike protection equipment at each pump station;

    v.    Provide detailed descriptions of its history of power-loss-related and lightning strike-related SSOs during the past five (5) years prior to the Date of Entry;

    vi.    Identify all measures necessary to correct all identified deficiencies, including all appropriate emergency procedures and

22

lightning strike-protection measures necessary to minimize power-loss related SSOs; and

vii.   Include expeditious schedules for the implementation of all identified measures; provided, however, that such schedules shall not extend beyond two (2) years of the Date of Entry.

D.   <u>Remedial Measures for Combined Sewer Overflows</u>

1.   <u>Nine Minimum Controls ("NMC") Compliance Plan</u>.   No later than six (6) months from the Date of Entry, Metro shall prepare and submit to EPA and the TDEC a NMC Compliance Plan evaluating and identifying corrective actions for achieving compliance as set forth in the CSO Control Policy with the NMCs set forth below. The NMC Compliance Plan shall include an implementation schedule for completing corrective actions on or before the deadlines set forth below. The identified corrective actions shall be in accordance with the "Guidance for Nine Minimum Controls", EPA 832-B-95-003, May 1995. The identified corrective actions shall be designed to achieve compliance with the following NMCs:

(a).   control of solid and floatable materials by installation of devices at CSO Outfalls within twenty four (24) months after the approval or modification of Metro's NMC Compliance Plan pursuant to Section VI of this Consent Decree.

2.   <u>Long Term Control Plan ("LTCP")</u>.   No later than twenty-four (24) months from the Date of Entry, Metro shall submit to EPA and TDEC an updated LTCP. The updated LTCP shall be consistent with the CSO Control Policy and EPA's "Guidance for Long-Term Control Plan," EPA 832-B-95-002, September 1995. The updated LTCP shall include

23

expeditious schedules, deadlines and timetables for remedial measures that will be designed to bring Metro's CSOs into full compliance with the water quality standards criteria as soon as practicable based on sound engineering judgment by no later than nine (9) years after the approval or modification of Metro's updated LTCP pursuant to Section VI of this Consent Decree.

(a)   The updated LTCP shall meet the following goals:

    i.   Ensure that if CSOs occur, they are only as a result of wet weather;

    ii.   Bring all wet weather CSO discharge points into compliance with the technology-based and water quality-based requirements of the CWA; and

    iii.   Minimize the impacts of CSOs on water quality, aquatic biota, and human health.

(b)   The updated LTCP shall include, at a minimum, the following elements:

    i.   The results of characterization, monitoring, and modeling activities as the basis for selection and design of effective CSO controls;

    ii.   A report on the public participation process that actively involved the public in the decision-making to select long-term CSO controls;

    iii.   Identification of how the LTCP addresses sensitive areas as the highest priority for controlling overflows;

    iv.   A report on the cost analyses of the alternatives considered;

24

v.      Operational plan revisions to include agreed-upon long-term CSO controls;

vi.     Maximization of treatment at Metro's existing WWTPs for wet weather flows;

vii.    Identification of and an implementation schedule for, the selected CSO controls; and

viii.   A post-construction compliance monitoring program adequate to ascertain the effectiveness of CSO controls and to verify compliance of Metro's CSOs with water quality-based CWA requirements.

## VIII.  SUPPLEMENTAL ENVIRONMENTAL PROJECT

A.      Metro shall perform and complete the Supplemental Environmental Project ("SEP") set forth in Appendix E, which has the objective of securing significant environmental or public health protection and improvements. Metro shall complete the SEP in accordance with the schedule and requirements set forth in Appendix E. The SEP shall be completed by December 31, 2010.

B.      The total expenditure for the SEP shall be not less than $2.8 million. Metro shall include documentation of the expenditures made in connection with the SEP as part of the SEP Completion Report described in Section VIII.E below. In the event that Metro fails to perform and complete the SEP as set forth in Appendix E, it shall pay stipulated penalties in accordance with Section X (Stipulated Penalties).

C.      Metro is responsible for the satisfactory completion of the SEP in accordance with

25

the requirements of this Decree. Metro shall be deemed to have satisfactorily completed the SEP when (1) EPA determines that Metro made good faith efforts to spend the entire amount set forth in Section VIII B; and (2) Metro certifies, with supporting documentation, that at least ninety (90) percent of the amount of money required to be spent on the SEP has been disbursed to pay for installation of wastewater collection and transmission systems necessary to allow residences in the Brandywine and Sanitarium Road neighborhoods to hook into Metro's Sewer System to alleviate a threat to nearby waters and to public health caused by the failure rate of septic tanks in those neighborhoods as identified by the Metro Public Health Department.

D.     Metro hereby certifies that, as of the date of this Consent Decree, Metro is not required by any federal, state, or local law or regulation to perform or develop the SEP; nor is Metro required by agreement, grant, or as injunctive relief in this or any other case to perform or develop the SEP. Metro further certifies that it has not received, and is not presently negotiating to receive, credit in any other enforcement action for the SEP; nor will Metro realize any profit attributable to or associated with the SEP, or receive any reimbursement for any portion of the SEP from any other person.

E.     <u>SEP Completion Report</u>. Metro shall complete the SEP by December 31, 2010. Metro shall submit a SEP Completion Report to the Parties within ninety (90) Days after completion of the SEP. The SEP Completion Report shall contain the following information:

1.     A detailed description of the SEP as implemented;

2.     A description of any implementation problems encountered and the solutions thereto;

3.     An itemization of all SEP costs and acceptable evidence of such costs;

26

4.    Certification that the SEP has been fully implemented pursuant to the provisions of this Consent Decree, including Appendix E;

5.    A description of the environmental and public health benefits resulting from implementation of the SEP (with a quantification of the benefits and pollutant reductions to the extent feasible); and

6.    Copies of any brochures, databases, software, or similar information relating to the SEP.

F.    <u>Periodic Reports</u>. While the SEP is being planned and implemented, Metro shall submit semiannual reports to the Parties describing the progress of the SEP up to and during the most recent Calendar Quarter within one (1) Month after the end of the second and fourth Calendar Quarters following the Date of Entry. Each periodic report shall contain the information described in Appendix E.

G.    Following receipt of the SEP Completion Report described in Section VIII.E above, EPA, after consultation with TDEC, will do one of the following in writing:

1.    accept the SEP Completion Report; or

2.    reject the SEP Completion Report, notifying Metro, in writing, of deficiencies in the SEP Completion Report

If EPA rejects the SEP Completion Report, Metro shall have one (1) Month from the date of receipt of EPA's notice in which to correct any deficiencies and submit a revised SEP Completion Report. Metro agrees to comply with any SEP related requirements imposed by EPA's notice, subject to dispute resolution.

H.    If upon receipt of the SEP Completion Report, EPA, after consultation with

27

TDEC, determines that part or all of the SEP has not been implemented in accordance with this Consent Decree, including Appendix E, and any statements of work, EPA may require Metro: (1) to perform additional tasks; (2) to repeat any deficient tasks; or (3) if specific tasks set forth in Appendix E were not performed at all, to perform such tasks. EPA shall provide any such requirement to Metro in writing. Metro agrees to comply with any SEP related requirements imposed by EPA's notice, subject to dispute resolution.

I.     Metro bears the burden of segregating eligible SEP costs from costs not eligible for SEP credit. Any cost evidence that contains costs that are both eligible and not eligible for SEP credits shall be disallowed in its entirety. For purposes of this Section VIII, "acceptable evidence" includes invoices, purchase orders, or other documentation that specifically identifies and itemizes the individual costs of the goods or services for which payment is made. Canceled drafts are not acceptable evidence unless such drafts specifically identify and itemize the individual costs of the goods or services for which payment is made.

J.     Metro hereby agrees that, in estimating the cost of the SEP, it did not take into account any savings Metro expects to achieve by claiming deductions on its state or federal tax returns. Metro further agrees that it will not claim a deduction on such tax returns based upon any funds expended by Metro in the performance of the SEP. Metro, at the time of completion of the SEP, shall submit to the United States and the State written certification that any funds expended in the performance of the SEP have not been and will not be claimed as a deduction on such taxes.

K.     Any public statement, oral or written, in print, film, or other media, made by Metro making reference to the SEP shall include the following language, "This project was

undertaken in connection with the settlement of a civil enforcement action taken by the United States and the State of Tennessee for violations of the Clean Water Act." If Metro fails to include such language, it shall immediately issue a retraction of its public statement.

## IX. CIVIL PENALTY

A.     Metro shall pay a civil penalty as follows:

1.     Metro shall make a payment to the United States of $282,019 within thirty (30) Days after the Date of Entry. Payment to the United States shall be made by electronic funds transfer, in accordance with written instructions to be provided by the United States after Date of Lodging of this Consent Decree. The costs of such electronic funds transfer shall be the responsibility of Metro. Metro shall send a copy of the electronic funds transfer authorization form, the electronic funds transfer transaction record, and the transmittal letter to the Parties as specified in Section XX (Form of Notice) below. The transmittal letter shall reference the case name, USAO File Number, and DJ No. 90-5-1-1-09000.

2.     Metro shall make a payment as directed by the State as follows: Metro shall spend $282,019 on the State Project in accordance with and as more particularly set forth in Appendix F of this Consent Decree. TDEC has approved this payment as an appropriate State Project recognizing the value of this project and its potential to positively impact the local environment.

3.     The payments at the direction of the State of $282,019, together with the payment to the United States of $282,019, constitute a total civil penalty of $564,038.

B.     In the event that full cash payment to the United States is not made within thirty (30) Days of the Date of Entry, Metro shall pay interest on the balance due from the original due

29

date to the date of payment, at the rate calculated pursuant to 28 U.S.C. § 1961.

## X. **STIPULATED PENALTIES**

A. EPA may assess against Metro stipulated penalties under the circumstances described below. Fifty (50) percent of each payment due pursuant to this Section shall be paid to the United States and fifty (50) percent shall be paid to the State.

1. <u>Unpermitted Discharges</u>. For each Unpermitted Discharge, EPA may assess a stipulated penalty. Any such penalty shall be determined as follows:

| If Unpermitted Discharge Occurs: | Penalty per Unpermitted Discharge: |
|---|---|
| After December 31, 2009 but on or before December 31, 2014 | $1,000 |
| After December 31, 2014 | $3,000 |

2. <u>Dry Weather CSOs</u>. For each CSO that occurs due to causes not associated with a wet weather event, EPA may assess a stipulated penalty. Any such penalty shall be determined as follows:

| If Dry Weather CSO Occurs: | Penalty per Unpermitted Discharge: |
|---|---|
| Within 12 Months of Date of Entry | $500 |
| More than 12 Months of Date of Entry | $1,000 |

3. <u>Failure to Timely Submit Deliverable</u>. For each Day Metro fails to Timely submit any Deliverable, EPA may assess daily stipulated penalties for each such Deliverable as follows:

| Period of Noncompliance: | Penalty Per Deliverable Per Day: |
|---|---|
| 1 - 10 Days | $500 |
| 11- 20 Days | $1,000 |

30

| | |
|---|---|
| 21- 60 Days | $2,000 |
| more than 60 Days | $3,500 |

      4.    <u>Failure to Timely Implement Work</u>. For each Day Metro fails to Timely implement any Work (other than the Timely submittal of a Deliverable or implementation of a SEP), EPA may assess daily stipulated penalties for each such item of Work as follows:

| Period of Noncompliance: | Penalty Per Violation Per Day: |
|---|---|
| 1 - 14 Days | $1,000 |
| 15 - 30 Days | $2,000 |
| 31 - 60 Days | $3,000 |
| 60-180 Days | $4,000 |
| more than 180 Days | $5,000 |

      5    <u>Failure to Timely Implement SEP Milestones</u>. For each Day Metro fails to Timely implement a SEP milestone set forth in Section VIII or Appendix E, EPA may assess daily stipulated penalties as follows:

| Period of Noncompliance: | Penalty Per Violation Per Day: |
|---|---|
| 1 - 15 Days | $1,000 |
| 16 - 30 Days | $1,500 |
| 31 - 60 Days | $2,500 |
| over 60 Days | $4,000 |

      6    <u>Failure to Complete a SEP or Failure to Spend Agreed-Upon Amount</u>. In the event that Metro fails to complete a SEP in accordance with the terms of this Consent Decree relating to the performance of the SEP as described in Section VIII and Appendix E, and/or to the

31

extent that Metro's actual expenditures for the SEP do not equal or exceed the required cost of the SEP as described in Section VIII.B, EPA may assess stipulated penalties according to the provisions set forth below:

(a). Except as provided in subparagraph (b) immediately below, if the SEP that has not been completed satisfactorily, EPA may assess a stipulated penalty in the amount of $375,000.

(b). If the SEP is not completed in accordance with Section VIII and Appendix E, but EPA determines that Metro (i) has made good faith efforts to complete the SEP; and (ii) has certified, with supporting documentation, that at least 90 percent of the amount of money required to be spent on the SEP, Metro shall not be liable for any stipulated penalty.

(c). If the SEP is completed in accordance with Section VIII and Appendix E, but Metro spent less than 90% of the amount of money required to be spent on the SEP, EPA may assess a stipulated penalty in the amount of $37,500.

(d). For failure to submit a SEP Completion Report required by Section VIII.E, EPA may assess a stipulated penalty in the amount of $1,000 for each Day after the report was originally due until the report is submitted.

(e). For failure to submit any other report required by Section VIII, or Appendix E, EPA may assess a stipulated penalty of $500 for each Day after the report was originally due until the report is submitted.

7    Delay in Payment of Civil Penalty.  In the event Metro fails to pay the United States and/or the State the civil penalty pursuant to Section IX.A, EPA or the State may assess a stipulated penalty of $2,000 for each Day that Metro is late in paying.

32

B.     Stipulated penalties shall automatically begin to accrue on the first Day of noncompliance as specified in paragraph A above, and shall continue to accrue through the final Day of the correction of the noncompliance, but shall only be payable as provided in Section X.C below.

C.     Metro shall pay stipulated penalties within thirty (30) Days of receipt of a written demand for payment. All stipulated penalties paid to the United States pursuant to this Section shall be made by electronic funds transfer, in accordance with written instructions to be provided by the United States after Date of Lodging of this Consent Decree. The costs of such electronic funds transfer shall be the responsibility of Metro. Metro shall send a copy of the electronic funds transfer authorization form, the electronic funds transfer transaction record, and the transmittal letter to the Parties as specified in Section XX (Form of Notice) below. The transmittal letter shall reference the case name, USAO File Number, and DJ No. 90-5-1-1-09000. All stipulated penalties paid to the State shall be paid by check payable to "The State of Tennessee." Each check shall reference the case name and civil action numbers herein and shall be sent to:

> Barry Turner
> Deputy Attorney General
> Office of the Tennessee Attorney General
> Environmental Division
> P. O. Box 20207
> Nashville, TN 37202

D.     In the event that a stipulated penalty is not paid in full when due, Metro shall pay interest on the balance due calculated pursuant to 28 U.S.C. § 1961, with interest accruing from the date payment of the stipulated penalty is due to the date of payment.

33

E.     Upon receipt of a written demand for payment of a stipulated penalty, Metro may dispute its liability for such stipulated penalty pursuant to the dispute resolution provisions of Section XII of this Consent Decree. In that event, any stipulated penalties and interest that are ultimately determined to be due under this Consent Decree shall be paid within thirty (30) Days of the date of EPA's written decision or, if applicable, any Court order. Stipulated penalties and interest shall continue to accrue during the pendency of the dispute, and EPA shall have the right to collect all penalties and interest that accrued during the dispute.

F.     The payment of stipulated penalties shall not alter in any way Metro's obligation to implement or complete all Work required under this Consent Decree.

G.     The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under the Consent Decree. In exercising its discretion under this paragraph, the United States shall consider, among other factors, the amount of time that has elapsed between the date that EPA became aware of the violation and the date of EPA's assessment of a penalty for that violation.

H.     Payment of stipulated penalties as set forth above shall be in addition to any other rights or remedies which may be available to the United States or the State by reason of Metro's failure to comply with requirements of this Consent Decree, and any applicable Federal, State or local laws, regulations, NPDES Permits and all other applicable permits, including but not limited to penalties and relief remedies under the CWA for future violations of the CWA, regardless of whether EPA could demand a stipulated penalty under this Consent Decree for those violations.

Case 3:07-cv-01056   Document 42   Filed 03/12/09   Page 34 of 57 PageID #: 844

## XI. **FORCE MAJEURE**

A. "Force Majeure" for the purposes of this Consent Decree is defined as an event arising from causes beyond the control of Metro or of any entity employed by Metro, including, but not limited to, its consultants and contractors, which delays or prevents the performance of any obligation under this Consent Decree, despite Metro's best efforts to fulfill the obligation. The requirement that Metro exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any potential Force Majeure event (1) as it is occurring and (2) following the potential Force Majeure event, such that delay is minimized to the greatest extent possible. Force Majeure does not include unanticipated or increased costs, financial inability to perform an obligation required by this Consent Decree, or a failure to achieve compliance with the NPDES permits, the TWQCA, the CWA or the CSO Control Policy. Application for construction grants, State Revolving Loan Funds, or any other grants or loans, or delays caused by inadequate facility planning or plans and specifications on the part of Metro do not constitute Force Majeure.

B. Solely for purposes of this Consent Decree, Metro shall be deemed to know of any circumstance of which Metro or any entity controlled by Metro, including Metro's consultants and contractors, knew or should have known.

C. Where any compliance obligation under this Consent Decree requires Metro to obtain a federal, State or local permit or approval, Metro shall submit timely and complete applications and take all other actions necessary to obtain such permits and approvals. Metro may seek relief under this Section for any delay in performance of any such obligation resulting from a failure to obtain or a delay in obtaining, any permit or approval required to fulfill such

35

obligation, if Metro has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits and approvals.

D.    When circumstances are occurring or have occurred which may delay the completion or prevent the performance of any requirement of this Consent Decree, whether or not due to a Force Majeure event, Metro shall notify EPA and TDEC in writing no later than twenty (20) Days after Metro knew, or in the exercise of reasonable due diligence under the circumstances, should have known, of the event. Notice shall be provided pursuant to Section XX (Form of Notice). The notice shall specifically reference this Section of the Decree and describe in detail: the basis for Metro's contention that it experienced or will experience a Force Majeure event if Metro intends to make a claim of Force Majeure; the obligations for which Metro believes performance will be delayed; the anticipated length of the delay; the precise cause or causes of the delay; the measures taken or to be taken to prevent or minimize the delay; and the timetable by which those measures will be implemented. Failure to so notify EPA and TDEC shall constitute a waiver of any claim of Force Majeure as to the event in question.

E.    If EPA, after consultation with TDEC, finds that a delay or prevention in performance is, or was, caused by a Force Majeure event, it shall extend the time for performance, in writing, for a period not exceeding the delay actually caused by such event, and stipulated penalties shall not be due for such period. In proceedings on any dispute regarding a delay in performance or prevention of performance, the dispute resolution provisions of Section XII shall apply, and Metro shall have the burden of proving that the delay in performance or prevention of performance is, or was, caused by a Force Majeure event, and that the amount of additional time requested is necessary to compensate for that event.

F. Compliance with a requirement of this Consent Decree shall not by itself constitute compliance with any other requirement. An extension of one compliance date based on a particular event shall not automatically extend another compliance date or dates. Metro shall make an individual showing of proof regarding the cause of each delayed incremental step or other requirement for which an extension is sought. Metro may petition for the extension of more than one compliance date in a single request.

## XII. <u>DISPUTE RESOLUTION</u>

A. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism available for resolving any disputes under this Decree between Metro and the United States. However, such procedures shall not apply to actions by the United States to enforce obligations of Metro that have not been disputed in accordance with this Section. The Parties acknowledge that the procedures of this Section shall not extend to disputes concerning the modification, revocation, renewal or reissuance of NPDES permits, which shall be governed by prevailing law.

B. Disputes with respect to any portion of a requirement of this Consent Decree shall not delay implementation of any portion of that requirement that is not in dispute and that is entirely independent of the requirement being disputed unless EPA agrees in writing, after consultation with the State, to a stay of Metro's obligation to perform, or the Court grants an order staying Metro's obligation to perform.

C. <u>Informal Dispute Resolution</u>. Metro shall invoke the informal dispute resolution procedures of this Section by notifying all other Parties in writing of the matter(s) in dispute and of Metro's intention to resolve the dispute under this Section. The notice shall: (1) outline the

37

nature of the dispute; (2) include Metro's proposed resolution; (3) include all information or data relating to the dispute and the proposed resolution; and (4) request negotiations pursuant to this Section to informally resolve the dispute. Metro and the United States shall then attempt to resolve the dispute informally for a period of thirty (30) Days from the date of the notice (or such longer period as Metro and the United States may agree in writing), with the goal of resolving the dispute in good faith, without further proceedings. Notice of any such extension shall be provided by Metro to the State. The State shall have the right to participate in informal negotiations between the United States and Metro as to disputes under this Consent Decree and all Parties may file a written statement of position. However, resolution of the dispute shall be solely between the United States and Metro. The period for such negotiations may be extended by written agreement of the United States and Metro. Notice of any such extension shall be provided by Metro to the State. If informal negotiations result in an agreement between the United States and Metro, such agreement shall be set forth in a single document in writing and Metro shall provide a copy to all Parties. If the United States and Metro cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, Metro invokes formal dispute resolution procedures as set forth below.

D.   Formal Dispute Resolution. Metro shall invoke formal dispute resolution procedures, within the time period provided in the preceding paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting Metro's position and any supporting documentation relied upon by Metro.

38

E.    The United States shall serve its Statement of Position within forty-five (45) Days of receipt of Metro's Statement of Position. The United States' Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States shall consult with the State during preparation of its Statement of Position. The United States' Statement of Position shall be binding on Metro, unless Metro files a motion for judicial review of the dispute in accordance with the following paragraph.

F.    <u>Judicial Dispute Resolution</u>. Metro may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XX (Form of Notice) and the Local Rules, a motion requesting judicial resolution of the dispute. The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding paragraph. The motion shall contain a written statement of Metro's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

G.    The United States shall have at least sixty (60) Days in which to respond to Metro's motion. The United States and Metro may file reply memoranda to the extent permitted by the Local Rules, or allowed by the Court.

H.    A dispute concerning EPA's failure to act on a submittal (i.e., to accept, require modification of, or reject the submittal), which Metro is required to submit for EPA's approval, shall be governed by the procedures of this Section. If Metro petitions the Court for resolution of such a dispute, Metro shall seek only an order from the Court directing EPA to act on the

39

submittal within an appropriate period of time.

I.    Except as provided in this Consent Decree, or agreed to in writing by the United States and Metro, or allowed by the Court, submission of any matter for dispute resolution under this Section shall not extend any of the deadlines set forth in this Consent Decree, or act as a stay of the disputed requirement and all dependent requirements.

J.    In any dispute in Court under this Section, Metro shall bear the burden of proving by a preponderance of the evidence that Metro's position on the issues in dispute should prevail over the United States' position. The United States or Metro may request an evidentiary hearing for good cause.

K.    Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Section X.E. If Metro does not prevail on the disputed issue, stipulated penalties may be assessed and shall be payable as provided in Section X (Stipulated Penalties).

## XIII. **RIGHT OF ENTRY**

A.    The United States and State and their authorized representatives and contractors shall have authority at all times, upon the presentation of proper credentials, to enter the premises of Metro to:

1.    Monitor the Work required by this Consent Decree;

2.    Verify any data or information submitted to the United States and State;

3.    Obtain samples from any portion of the WWTPs or the Sewer System;

4.    Inspect and evaluate any portions of the WWTPs or the Sewer System;

5.    Inspect and review any records required to be kept under the terms and

40

conditions of this Consent Decree or any NPDES Permit, the CWA and the TWQCA; and

      6.    Otherwise assess Metro's compliance with federal and state environmental laws and this Consent Decree.

    B.    The rights created by this Section are in addition to, and in no way limit or otherwise affect, the authority of the United States and State to conduct inspections, to require monitoring and to obtain information from Metro as authorized by law.

    C.    The United States and the State agree to provide Metro an opportunity to obtain split samples of samples taken by the United States or the State.

## XIV. **NOT A PERMIT**

This Consent Decree is not and shall not be construed as a permit, nor a modification of any existing permit, issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, nor shall it in any way relieve Metro of its obligations to obtain permits for its WWTPs and related operations or facilities and to comply with the requirements of any NPDES permit or with any other applicable federal or State law or regulation. Any new permit, or modification of existing permits, must be complied with in accordance with applicable federal and State laws and regulations.

## XV. **ONGOING COMPLIANCE OBLIGATIONS**

    A.    Nothing herein shall be construed to relieve Metro of the duty to comply with the CWA or the TWQCA, the regulations promulgated thereunder, and all applicable permits issued thereunder, including the NPDES Permits, or to relieve Metro of its duty to comply with other applicable federal, State and local laws and regulations.

    B.    The United States and State, by their consent to the entry of this Consent Decree,

Case 3:07-cv-01056   Document 42   Filed 03/12/09   Page 41 of 57 PageID #: 851

do not warrant or aver in any manner that Metro's compliance with this Consent Decree will result in compliance with the provisions of the CWA, the TWQCA, the CSO Control Policy, or with the NPDES Permits.

C.    Notwithstanding review or approval by the United States or State of any plans, reports, policies or procedures formulated pursuant to this Consent Decree, Metro shall remain solely responsible for any noncompliance with the terms of this Consent Decree, all applicable permits, including the NPDES Permits, the TWQCA, the CWA, the CSO Control Policy, applicable local laws, and regulations promulgated thereunder.

## XVI.  <u>NON-WAIVER PROVISIONS</u>

A.    This Consent Decree is entered in full and final settlement of the civil claims for the violations alleged in the Plaintiffs' Complaints, but shall not affect rights or obligations not specifically addressed herein, as to which the Parties specifically reserve their rights.

B.    Nothing contained in this Consent Decree shall be construed to prevent or limit the rights of the United States or the State to seek penalties or further or additional relief under the CWA or other federal statutes or regulations, or State laws and regulations. The United States and the State reserve the right to file a civil action for statutory penalties or injunctive relief against Metro for any violations of the CWA and/or the TWQCA by Metro not expressly identified as violations in their Complaint. The Complaints assert only claims of civil liability under the CWA against Metro, and therefore this Consent Decree only pertains to and resolves such civil liabilities of Metro under the CWA and no other liabilities, criminal or otherwise.

C.    This Consent Decree in no way affects or relieves Metro of any responsibility to comply with any federal, state, or local law or regulation. The Parties agree that Metro is

42

responsible for achieving and maintaining compliance with all applicable federal, State and local laws, regulations, permits and ordinances.

D.    This Consent Decree does not limit or affect the rights of the Parties as against any third parties which are not Parties to this Consent Decree. The Parties recognize that this Consent Decree resolves certain matters between the Parties, and that its execution does not preclude Metro from asserting any legal or factual position in any action brought against Metro by any person or entity not a Party to this Consent Decree. Metro reserves the right to contest all factual and legal positions taken in any pending and future proceedings other than an action to enforce this Consent Decree brought by a Party.

E.    The Parties reserve any and all legal and equitable remedies available to enforce the provisions of this Consent Decree.

F.    This Consent Decree shall not limit any authority of EPA or TDEC under any applicable statute, including the authority to seek information from Metro or to seek access to the property of Metro nor shall anything in this Consent Decree be construed to limit the authority of the United States or State to undertake any action against any person, including Metro, in response to conditions that may present an imminent and substantial endangerment to the environment or to the public health or welfare.

G.    Obligations of Metro under the provisions of this Consent Decree to perform duties that may occur prior to the Date of Entry, shall be legally enforceable from the Date of Entry. Liability for stipulated penalties, if applicable, shall accrue for violation of such obligations and payment of such stipulated penalties may be demanded by EPA after the Date of Entry.

43

H.     This Consent Decree was negotiated, mutually drafted, and executed by the Parties in good faith to avoid further litigation and is a settlement of claims that were vigorously contested, denied and disputed. Neither the execution of this Consent Decree nor any action taken hereunder is an admission of any fact, liability, or wrongdoing of any kind regarding any of the matters addressed in the Consent Decree.

## XVII.  COSTS OF SUIT

The Parties shall bear their own costs and attorneys' fees with respect to matters related to this Consent Decree.

## XVIII.  CERTIFICATION OF SUBMISSIONS/RECORD RETENTION

A.     Metro shall retain all data, documents, plans, records and reports, including research reports that Metro has relied upon, (1) that relate to Metro's performance under any Deliverable or SEP, and (2) which are in the possession, custody, or control of Metro or its consultants or contractors. Metro shall retain all such materials for five (5) years from the date of origination. Drafts of final documents, plans, records, or reports do not need to be retained.

B.     At any time during this retention period, upon request by EPA or TDEC, Metro shall submit copies of such materials required to be maintained under this Section within thirty (30) Days of such request, or such longer time as agreed upon by the requesting Party. The requesting Party shall not unreasonably refuse to extend such deadline. This Section does not limit or affect any duty or obligation of Metro to maintain records or information required by the NPDES Permits.

C.     At the conclusion of this retention period, Metro shall notify EPA, DOJ, and the State at least one-hundred and twenty (120) Days prior to the destruction of any such materials,

44

and upon request by any of these Parties, Metro shall deliver any such materials to that Party or other specified Party.

D.    In all notices, documents or reports submitted to the United States and/or State pursuant to this Consent Decree, Metro shall, by a responsible party of Metro, as defined by 40 C.F.R. §122.22 or Part I.D.1 of the NPDES Permits, sign and certify each such notice, document and report as follows:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering such information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XIX.  **REPORTING REQUIREMENTS**

A.    Beginning thirty (30) Days after the first Calendar Quarter following the Date of Entry, and thirty (30) Days after each Calendar Quarter thereafter until termination of the Consent Decree, Metro shall submit to the Parties, and simultaneously place in the PDR, a Quarterly Progress Report. Quarterly Progress Reports shall not be subject to the Public Review Requirement of Section VI.A.2. However, Metro shall receive questions and comments from the public for Metro's review for a period of twenty (20) Days following placement in the PDR. Each Quarterly Progress Report shall contain at a minimum:

1.    A description of the Work conducted during the previous quarter to comply with the requirements of this Consent Decree, in Gantt chart or similar format;

2.    The date, location, duration, volume, and cause of all SSOs and dry

45

weather CSOs for the current quarter;

       3.    The anticipated Work that will be performed in the successive quarter to comply with the requirements of this Consent Decree, in Gantt chart or similar format; and

       4.    Any additional information necessary to demonstrate that Metro is adequately implementing the Work.

       B.    Beginning on January 31, 2009, and every twelve (12) Months thereafter until termination of this Consent Decree, Metro shall submit to the Parties, and simultaneously place in the PDR, an Annual Report. The Annual Report shall cover the most recent Calendar Year. The Annual Report shall not be subject to the Public Review Requirement of Section VI.A.2. However, Metro shall accept questions and comments from the public for Metro's review for a period of twenty (20) Days following placement in the PDR. Each Annual Report shall contain at a minimum:

       1.    A summary of the CMOM Programs implemented or modified pursuant to this Consent Decree (including those programs described in Metro's Self-Assessment in Appendix B), including a comparison of actual performance with any performance measures that have been established;

       2.    Specific dates for beginning and completing projects and activities identified by Metro in the CAP/ER, the NMC Compliance Plan and/or LTCP for the upcoming Calendar Year; and

       3.    A trends analysis of the number, volume, duration and cause of Metro's SSOs and dry weather CSOs for a twenty-four (24)-Month period updated to reflect the SSOs and dry weather CSOs that occurred during the previous Calendar Year.

C.     Compliance with this Section does not relieve Metro of any other reporting

obligation imposed under any law, regulation, or permit.

D.     Notification to EPA or TDEC pursuant to this Section of an anticipated delay

shall not by itself excuse the delay or otherwise satisfy the notification requirements set forth in

Section XI (Force Majeure).

E.     Metro may request in writing a modification of the items to be addresssed in the

Quarterly Progress Report or the Annual Report. This may include a request to move items

currently addressed in the Quarterly Progress Report to the Annual Report. Any such

modification is a Non-Material Modification under Section XXI (Modification).

## XX.   FORM OF NOTICE

A.     Unless otherwise specified, or as may be changed from time to time, all reports,

notices, or any other written communications required to be submitted under this Consent Decree

shall be sent to the respective Parties at the following addresses:

As to the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044-7611
Reference DOJ Case No. 90-5-1-1-09000

United States Attorney
Middle District of Tennessee
110 Ninth Avenue, South, Suite A961
Nashville, TN 37203

Chief
Water Programs Enforcement Branch
Water Management Division

47

U.S. Environmental Protection Agency,
Region 4
Atlanta Federal Center
61 Forsyth Street, S.W.
Atlanta, Georgia 30303

For oral notification: Doug Mundrick, Chief, Water Programs Enforcement Branch, (404) 562-9328 (subject to change on written notice to Metro).

As to the State of Tennessee:

Barry Turner
Deputy Attorney General
Office of the Tennessee Attorney General
Environmental Division
P.O. Box 20207
Nashville, TN 37202

As to TDEC:

Patrick Parker
Assistant General Counsel
Tennessee Department of Environment and Conservation
20th Floor, L & C Tower
401 Church Street
Nashville, TN 37243

As to Metro:

Director/Chief Operating Officer
Metro Water Services
1600 2nd Avenue North
Nashville, TN 37208

B.     Notifications to or communications with the Parties shall be deemed submitted on

the date they are postmarked.

48

## XXI. **MODIFICATION**

This Consent Decree, including Appendices, contains the entire agreement of the Parties and shall not be modified by any prior oral or written agreement, representation, or understanding. Prior drafts of this Consent Decree shall not be used in any action involving the interpretation or enforcement of this Consent Decree. Except as set forth below, this Consent Decree may not be materially amended or modified except by written agreement of the Parties, and approval of this Court ("Material Modification"). Any Material Modification of this Consent Decree shall be effective upon approval of the Court. Except as provided in the following sentence, non-material modifications of the Consent Decree which do not significantly alter the requirements of this Consent Decree may be made in writing by the United States after consultation with the State ("Non-Material Modification"). Non-Material Modifications which affect only Metro's obligations to the State may be made by written agreement with the State. Except as provided in Section VI D, any changes to the deadlines established in CAP/ER, NMC Compliance Plan, or the LTCP of this Consent Decree shall be considered Material Modifications.

## XXII. **PUBLIC COMMENT**

The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree are subject to the requirements of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and consideration of any comments. Metro and the State consent to the entry of this Consent Decree without further notice.

49

## XXIII. CONTINUING JURISDICTION OF THE COURT

The Court shall retain jurisdiction to effectuate and enforce the terms and conditions and achieve the objectives of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction, modification, implementation, or execution of this Consent Decree.

## XXIV. FINAL COMPLIANCE AND TERMINATION

A.     Metro shall achieve final compliance with all terms of this Consent Decree on or before nine (9) years after the approval or modification by EPA of either the CAP/ER or the updated LTCP pursuant to Section VI of this Consent Decree, whichever comes later. All Work required under this Consent Decree shall be completed by that time. The United States' determination that the Consent Decree should be terminated shall be based on a consideration of whether all of the following have occurred, after consultation with the State:

1.     Metro has paid all civil and stipulated penalties it is obligated to pay under this Consent Decree;

2.     Metro has completed all Work required pursuant to Sections VII (Performance of the Work); VIII (Supplemental Environmental Project); XVIII (Certification of Submissions/Record Retention) and XIX (Reporting Requirements) of this Consent Decree; and

3.     Metro has provided certification of its payment of all outstanding penalties and its completion of performance of the Work described in Section XXIV A 2 above.

B.     Metro may request that the United States make a determination pursuant to Section XXIV.A that this Consent Decree may be terminated. Any such request shall be in writing and shall include a certification, that the requirements of Section XXIV.A have been met.

50

Metro shall serve a copy of any such request on all Parties.

      C.      If the United States agrees, after consultation with the State, that Metro has met the requirements of Section XXIV A above, the United States will file a motion with the Court seeking an order terminating the Consent Decree. If the United States determines not to seek termination of the Consent Decree, the United States shall so notify the Parties in writing. The United States' notice shall summarize the basis for its decision and describe the actions necessary to achieve final compliance. If Metro disagrees with any such determination by the United States not to seek termination of the Consent Decree, Metro must invoke the dispute resolution procedures of Section XII (Dispute Resolution) before filing any motion with the Court regarding the disagreement.

## XXV.   RESCISSION OF ORDER AND ASSESSMENT NO. 99-0390

      The State will take the necessary steps to rescind existing Order and Assessment No. 99-0390 against Metro as of the Date of Entry of this Consent Decree. Metro's obligations under Order and Assessment No. 99-0390 shall terminate upon entry of this Consent Decree. Further, upon entry of this Consent Decree, its provisions shall supercede Order and Assessment No. 99-0390 with respect to any unfulfilled obligation(s) of Metro pursuant to Order and Assessment No. 99-0390 and Metro shall have no liability or legal responsibility with respect to any such unfulfilled obligation(s).

## XXVI. FINAL JUDGMENT

      Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the Parties. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54

and 58.

## XXVII. SIGNATORIES

A.     The Assistant Attorney General, on behalf of the United States, and the signatories for the State and Metro, certify that they are fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Parties to this document.

B.     Metro and the State agree not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States has notified them in writing that it no longer supports entry of this Consent Decree.

C.     Metro's agent identified on the attached signature page is authorized to accept service of process by mail on Metro's behalf with respect to all matters arising under or related to this Consent Decree. Metro agrees to accept service of process in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to service of a summons.

Dated and entered this 12th day of March, 2009 ~~2007~~

_____
UNITED STATES DISTRICT JUDGE

52

WE HEREBY CONSENT to the entry of this Consent Decree in United States, et al. v. Metropolitan Department of Water and Sewerage Services, Civil Action No. _____, subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

FOR PLAINTIFF THE UNITED STATES OF AMERICA

DATE: *19 Oct. 2007*

RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

DATE: 10/22/2007

KARL J. FINGERHOOD
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
Post Office Box 7611
Washington, D.C. 20044
(202) 514-7519

EDWARD M. YARBROUGH
United States Attorney
Middle District of Tennessee

DATE: 10/33/07        By: 

LISA S. RIVERA
Assistant United States Attorney
Middle District of Tennessee
110 Ninth Avenue, South, Suite A961
Nashville, TN 37203
(615) 736-5151

53

I HEREBY CONSENT to the entry of this Consent Decree in United States, et al. v. Metropolitan Department of Water and Sewerage Services, Civil Action No. _____, subject to the public notice and comment requirements of 28 C.F.R § 50.7.

DATE: _September 20, 2007_

_Granta Y. Nakayama_
GRANTA NAKAYAMA
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

54

DATE: 8/29/07

_(signature)_

MARY WILKES
Regional Counsel
United States Environmental
      Protection Agency - Region 4
 Atlanta Federal Center
61 Forsyth Street, S.W.
Atlanta, GA 30303

DATE: 8/28/07

_(signature)_

WILLIAM B. BUSH, JR.
Associate Regional Counsel
United States Environmental
      Protection Agency - Region 4
Atlanta Federal Center
61 Forsyth Street, S.W.
Atlanta, GA 30303
(404) 562- 9538

55

WE HEREBY CONSENT to the entry of this Consent Decree in United States, et al. v. Metropolitan Department of Water and Sewerage Services, Civil Action No. _____.

FOR PLAINTIFF THE STATE OF TENNESSEE

DATE: _____

BARRY TURNER
Deputy Attorney General
Office of the Tennessee Attorney General
Environmental Division
Post Office Box 20207
Nashville, TN 37202-0207
(615) 532-2586

Case 3:07-cv-01056   Document 42   Filed 03/12/09   Page 56 of 57 PageID #: 866

WE HEREBY CONSENT to the entry of this Consent Decree in United States, et al v. Metropolitan Department of Water and Sewerage Services, Civil Action No. _____.

FOR DEFENDANT METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

DATE: _10/18/07_ _____

THOMAS G. CROSS
Assistant Metropolitan Attorney
108 Metropolitan Courthouse
Nashville, TN 37201

Agent authorized to accept service of process on behalf of Metro:

Director/Chief Operating Officer
Metro Water Services1600 2nd Avenue NorthNashville, TN 37208

57